# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>ENERGY FUTURE<br>HOLDINGS CORP., *et al.*,<br><br>*Debtors.* | Chapter 11<br><br>Bankr. Case No. 14-10979 (CSS)<br><br>Jointly Administered |
| CSC TRUST COMPANY OF<br>DELAWARE, as INDENTURE TRUSTEE,<br><br>*Appellant,*<br>v.<br><br>ENERGY FUTURE<br>HOLDINGS CORP., *et al.*,<br><br>*Appellees.* | Case No. 1:14-cv-00723 |

**REPLY OF CSC TRUST COMPANY OF DELAWARE
IN SUPPORT OF EMERGENCY MOTION FOR STAY PENDING APPEAL OF
BANKRUPTCY COURT'S ORDER APPROVING FIRST LIEN SETTLEMENT**

Debtors' opposition to a brief stay is long on hyperbole and bald assertions that they have cleverly structured the settlement so as to effectively preclude review by this Court. But it is short on any explanation as to *why* this Court's review must be concluded by June 13, whereas the *Bankruptcy Court* was given until at least July 13 for its consideration. This Court should reject Debtors' attempt to sideline this Court, and grant a brief stay that would allow for full appellate review of Debtors' unprecedented tender offer.

This Reply directly addresses the Affidavit of Anthony Horton attached to the Debtors' opposition, and certain arguments in the opposition that completely avoid the issues the 10% Trustee raises. Most importantly, Mr. Horton was not called as a witness at trial.[1] He now asserts that a stay of approval of the settlement will jeopardize their financing, and indeed the entire $42 billion restructuring will be at risk, if this court merely preserves the status quo for a short period of time. ***This is directly contrary to the Debtors' Motion to Approve the Financing.*** In footnote 7 of that motion, EFIH specifically told the Bankruptcy Court that EFIH "will seek to consummate the full EFIH First Lien Financing *regardless of whether the EFIH Makewhole Settlements are approved.*" (Bankr. D.I. 74 at 8 n.7 (emphasis added)).

This is beyond the pale. There is no other explanation for this other than a cynical attempt to manipulate this Court, which has very little time to evaluate a stay. It now definitely confirms the Debtors' tactics, in which their chief financial officer testified at

---

[1] Indeed, Mr. Horton had submitted an affidavit in connection with briefing in the bankruptcy court but the Debtors affirmatively decided *not* to rely on his testimony at trial. Hearing Transcript at 136:4–13.

1

trial that he did not know when the $5.4 billion financing was planned for closing, and now a footnote in their opposition says they likely will not fund their financing and close the settlement for still another five days, Opp. 10, n.3, yet EFIH asserts that a short stay to allow *this Court* to consider the issue will cause all to come crashing down. Seemingly, there it time for everyone except this Court. This Court must, at the very least, hold a hearing on the stay. It cannot base a stay decision on an affidavit that is so clearly contradicted by EFIH's own papers on *the exact issue that is the centerpiece of the opposition.*

To be clear, the 10% Trustee is only appealing the approval of the First Lien Settlement, not the entire DIP financing transaction. Contrary to their arguments in this Court, Debtors have told the Bankruptcy Court that the broader First Lien DIP Financing does *not* turn on approval of the First Lien Settlement. All of the Debtors' arguments about expiration of the availability of financing and the astronomical bond are utterly inconsistent with what they said previously: Debtors' own DIP Financing motion contemplates delayed (or non-) approval of the settlement, but that the financing would nonetheless proceed.

On the merits, Debtors' opposition betrays the failings of their case, simply ignores the thrust of the 10% Trustee's argument, and further attempts to manipulate the system to preclude appellate review. The Court should grant the request for a stay, set a modest bond to cover the de minimis interest differential during an appeal, and set a briefing schedule that would allow prompt, but full, consideration by this Court (or allow the appeal to proceed to the Court of Appeals on a expedited direct review if accepted) of

the novel and important questions presented by Debtors' unprecedented attempt to reshape the manner in which major commercial bankruptcy cases are conducted.

I. **DEBTORS' FAIL TO EXPLAIN WHY THE FINANCING PERIOD IS SHORTER FOR THIS COURT'S REVIEW THAN FOR THE BANKRUPTCY COURT'S REVIEW**

Debtors fail to address the fact, explained in the 10% Trustee's motion, that the supposed urgency that caused the Bankruptcy Court to shorten the statutory 14-day stay, is purely a creature of Debtors' invention. Debtors stress repeatedly that the "financing commitment is contingent on the Settlement and expires *this Friday*," Opp. 2, breathlessly asserting that "the entire $5.4 billion First Lien DIP Financing may unravel if the Settlement is stayed for even a brief period," *id.* at 9; *see id.* at 10, 11, 18, 19, 20. But Debtors fail even to acknowledge that the June 13 expiration date is calculated as five days after entry of the Bankruptcy Court's order, and thus *only limits the time for appeal.* The financing itself was open until August 16, 2014, meaning that the Bankruptcy Court could have had until then to consider the Debtors' unprecedented transaction. And Debtors inform the Court that they may not even close by June 13, as that deadline may be extended for their own purposes. Opp. 10, n.3. Debtors' failure to explain why 110 days was fast enough when the matter was before the Bankruptcy Court but not when in *this Court*, or why a further extension is permissible for their own purposes but not this Court's, reveals that Debtors' real purpose in establishing the five-day-post-approval deadline is to preclude this Court's review. The Court should reject Debtors' transparent attempt to conjure a fictitious emergency so as to avoid full judicial review.

3

## II. DEBTORS FAIL TO ACKNOWLEDGE THE IRREPARABLE HARM THAT THE SETTLEMENT AGREEMENT INFLICTS ON THE 10% TRUSTEE

Debtors' self-serving assertion that the "relief that the First Lien Trustee is seeking [is] more money," Opp. 9, mischaracterizes the injury that the 10% Trustee seeks to avoid. The irreparable injury is to its right to a process under which all similarly situated class members are treated equally, and is in fact likely to result in a distribution of new securities, rather than cash, under a reorganization plan. Inadvertently, Debtors' brief *confirms* the extent of the injury to the 10% Trustee. Specifically, the effect of the most favored nations ("MFN") clause (given to only two settling parties) is that non-settling 10% noteholders *cannot* negotiate for themselves a full range of settlements that would normally be available as litigation progresses.

The MFN effectively imposes a surtax on any settlement the 10% Trustee might try to negotiate with Debtors. If, for example, the 10% Trustee negotiated payment of 110% of principal, EFIH would also be required to pay the settling noteholders an additional 5% of principal above what they are entitled to under the Settlement Agreement. That additional amount acts as a surtax on the 10% Trustee's settlement, effectively discouraging settlement. (Indeed, because of the surtax, it would be economically irrational for Debtors to settle with the 10% Trustee even at a discount off the 10% Trustee's claims. If, for example, Debtors settled with the 10% Trustee for 117% of principal, the surtax payments to the settling noteholders would push the effective cost of a 117% settlement above total 119% of principal the 10% Trustee could win at trial.) It is not surprising, then, that Debtors repeatedly refer to the non-settling noteholders' ability to seek to vindicate their rights "at trial," Opp. 1, 7, 8, rather than

4

their congressionally created right to negotiate for a full range of deals as a class in chapter 11.[2]

Another way to view the same point is thus: the holders who received an MFN have guaranteed themselves equal treatment if other class members do better, getting the effect that Section 1129(a)(4) guarantees in bankruptcy, while at the same time taking away that guaranty of equal treatment from the 10% Trustee.

## III. DEBTORS IGNORE THE FACT THAT NO COURT HAS EVER APPROVED A TENDER OFFER IN BANKRUPTCY OVER OBJECTIONS

Debtors' assert that "Securities offerings outside of a chapter 11 solicitation *have been conducted* in bankruptcies." Opp. 17 (emphasis added). The passive "have been conducted" formulation is notable, because, as the 10% Trustee's motion pointed out, in all three "examples" that debtors cite, the courts did not confront the question whether the

---

[2] Indeed, the MFN clause may ensure disparate treatment that favors two particular 6⅞% noteholders, based on one particular new interpretation and justification for that clause that appears in the Opposition for the first time The Debtors say that the settlement is nondiscriminatory because the nominal number, 5%, given in settlement is the same for all holders. They had previously justified this only on grounds of "simplicity" and their witnesses acknowledged the disparate treatment.

It is impossible, under this reading of the treatment afforded under the settlement and with an MFN clause, for the non-settling 10% noteholders to obtain a settlement of their claims that is as favorable as the settlement those 6⅞% noteholders have obtained for themselves. That is true for several reasons. The Debtors' characterization of the premium as just a number, "105% of principle," Opp. 2 (or "105% par," *id.* at 14), suggests that, as a practical matter, in light of the MFN clause, the Debtors could never agree to a settlement with the 10% Trustee for more than 108.1%. Under the Settlement Agreement's MFN clause, two 6⅞% noteholders are entitled to any preferable terms of a later settlement. If the premium is just a nominal number, then the 6⅞% noteholders would be entitled to a 10% premium if the 10% Trustee were to negotiate a settlement for 110% of principal. Yet Debtors could never agree to such a settlement (and the Bankruptcy Court would never approve it), because that would pay the 6⅞% noteholders a premium *above* full recovery of the entirety of their redemption premium claims (which are 8.1% of principal). If, on the other hand, there is an implicit cap at 100% of the 6⅞% noteholders' redemption premium claims, that only validates the 10% Trustees' argument that the settlement should be evaluated by what percentage recovery of the redemption premium claims it provides to each class (62% to the 6⅞% noteholders, but only 26% to the 10% noteholders). And even if there is a cap, the 6⅞% noteholders would get 100% of their claims, whereas the 10% noteholders would get some lesser percentage. In other words, the terms of the settlement agreement, as characterized by Debtors in their Opposition, effectively locks in place disparate treatment of the 10% and 6⅞% noteholders.

tender process was appropriate in chapter 11, because no party raised such an objection. This is the first case in which the issue has been joined, and even the Bankruptcy Court acknowledged that it had "ha[d]n't had an opportunity to really ... really think about it in an organized ma[nn]er." Hearing Transcript 260:1–261:7. Debtors' expert adviser admitted the novelty and lack of prior challenge on the witness stand. *Id.* at 169:16–25. In other words, the Debtors try to obfuscate to this Court points their own witnesses conceded.

## IV. DEBTORS' REQUEST FOR A $5.4 BILLION BOND IS SIMPLY ANOTHER ATTEMPT TO PRECLUDE APPELLATE REVIEW

Debtors insist that, as the price for a stay in order to appeal a claim worth $655 million plus interest, the 10% Trustee should post a bond for the full $5.4 billion First Lien DIP Financing, even though the 10% Trustee settled its objections to the First Lien DIP Financing, and that is not even the subject of the present appeal. This is not a situation of bonding a $5.4 billion judgment. It is even in the Debtors' formulation only a refinancing and redemption. If the entire transaction were reversed (which is not what the 10% Trustee asks), the only difference is that instead of $5.4 billion of the new postbankruptcy secured loans, there would still be $5.4 billion of secured prebankruptcy loans. The only real difference might be the "interest burn" of $14 million per month for the short duration of an expedited appeal.[3]

The only matter at issue in this appeal is the settlement of the redemption premium claims. And, again, the Debtors contemplated this segregation in their DIP

---

[3] The fees associated with the First Lien DIP Financing are not counted in the Debtors' calculation, so the potential damages are actually even lower than the "interest burn" amount.

Financing Motion: *"Importantly, the EFIH Debtors will seek to consummate the full EFIH First Lien DIP Financing regardless of whether the EFIH Makewhole Settlements are approved."* (Bankr. D.I. 74 at 8 n.7). The 10% Trustee cannot be asked to post bond to secure financing for the entire transaction when it is only challenging the settlement, especially when the Debtors have specifically provided that the whole transaction can go forward with or without approval of the settlement.

Debtors might just as well have insisted on bond for the entirety of their "massive $42 billion restructuring effort," Opp. 19, and indeed try to influence this Court with that. Any such bond, of either amount, is equally inappropriate. Once again, Debtors' argument is long on hyperbole and self-inflicted poison pills designed to prevent appellate review.

This Court should not permit itself to be bullied into relinquishing its judicial role. The enormous bonds cited by Debtors, Opp. 19, are not analogous at all. They concerned attempts to upset final bankruptcy plans that had already been approved by bankruptcy courts. In saying that the entire restructuring needs protecting, Debtors here ask instead for protection of a transaction that will not even be considered for approval for nine months, and may very well not be approved. Imposing a massive bond to protect a transaction for which the creditors still have a right to object at the trial court level (the Bankruptcy Court) might be the first attempt to use appellate issues (a bond) on one issue to foreclose as a practical matter even the first level of judicial scrutiny of bankruptcy transactions to be approved later. The Debtors chose not to undertake all their transactions at the same time as a reorganization plan approval, and they cannot use the full restructuring to justify an enormous bond.

7

All that Debtors stand to lose is the differential between the current interest rate on those claims and the interest rate if Debtors were able to capitalize those claims with new debt at a lower rate. As explained in the 10% Trustee's motion, that loss would be less than $1 million over the period of a typical expedited appeal.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court pursuant to Bankruptcy Rule 8005 stay pending appeal the order authorizing the EFIH First Lien Settlement.

*[Remainder of Page Left Intentionally Blank]*

Dated: June 11, 2014
Wilmington, Delaware

    Respectfully submitted,

    COLE, SCHOTZ, MEISEL,
    FORMAN & LEONARD P.A.

    /s/ Norman L. Pernick
    Norman L. Pernick (DE No. 2290)
      npernick@coleschotz.com
    500 Delaware Avenue
    Suite 1410
    Wilmington, DE 19801
    Tel: 302.652.3131
    Fax: 302.652.3117

    -AND-

ROPES & GRAY LLP
Keith H. Wofford
  keith.wofford@ropesgray.com
Michael S. Winograd
  michael.winograd@ropesgray.com
1211 Avenue of the Americas
New York, NY 10036-8704
Tel: 212.596.9000
Fax: 212.596.9090

D. Ross Martin
  ross.martin@ropesgray.com
Andrew G. Devore
  andrew.devore@ropesgray.com
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel: 617.951.7000
Tel:   617.951.7050

    -AND-

DRINKER BIDDLE & REATH LLP
James H. Millar
  James.Millar@dbr.com
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Tel: 212.248.3264
Fax:   212.248.3141

*Counsel for CSC Trust Company of Delaware
as successor indenture trustee*