In re: Energy Future Holding Corp., et al.,

                    Debtors.

Delaware Trust Company,
as Indenture Trustee,

                    Appellant,

     v.

Energy Future Intermediate Holdings, LLC and
EFIH Finance, Inc.,

                    Appellees.

Chapter 11
Bankruptcy Case No. 14-10979-CSS
(Jointly Administered)

Civil Action No. 14-723-RGA

## MEMORANDUM OPINION

Norman L. Pernick, Esq., J. Kate Stickles, Esq., Cole, Scholtz, Meisel, Forman & Leonard, PA, Wilmington, DE, Keith H. Wofford, Esq., D. Ross Martin, Esq. (argued), Ropes & Gray, LLP, New York, NY, Andrew G. Devore, Esq., Erin R. Macgowan, Esq., Ropes & Gray, LLP, Boston, MA, James H. Millar, Esq., Drinker Biddle & Reath, LLP, New York, NY, attorneys for Appellant Delaware Trust Company.

Mark D. Collins, Esq., Daniel J. DeFranceschi, Esq., James M. Madron, Esq., Richards, Layton & Finger, PA, Wilmington, DE, Edward O. Sassower, Esq., Stephen E. Hessler, Esq., Brian E. Schartz, Esq., Kirkland & Ellis, LLP, New York, NY, James H.M. Sprayregen, Esq., Chad J. Husnick, Esq., Steven N. Serajeddini, Esq., Andrew McGaan, Esq. (argued), Kirkland & Ellis, LLP, Chicago, IL, attorneys for Appellee, Energy Future Intermediate Holdings, LLC, and EFIH Finance, Inc.

Karen C. Bifferato, Esq., Connolly Gallagher, LLP, Wilmington, DE, Jeffrey S. Sabin, Esq., Bingham McCutchen LLP, New York, NY, Julia Frost-Davies, Esq., Patrick Strawbridge, Esq. (argued), Christopher L. Carter, Esq., Bingham McCutchen LLP, Boston, MA, attorneys for Intervenor Pacific Investment Management Company, LLC.

February 19, 2015

ANDREWS, U.S. District Judge:

Presently before the Court is Delaware Trust Company's appeal (D.I. 1) from the
Bankruptcy Court's Order Approving First Lien Settlement (D.I. 1-1) in the chapter 11
bankruptcy case of Energy Future Holding Corporation.

## I. BACKGROUND

Energy Future Holding Corporation and its subsidiaries ("Debtors") filed for chapter 11
bankruptcy relief in the United States Bankruptcy Court for the District of Delaware on April 29,
2014. Debtors are organized into two principal businesses, one of which is Energy Future
Intermediate Holdings, LLC ("EFIH"), Appellee[1] in this case. EFIH's primary asset is an 80%
ownership stake in Oncor, the largest regulated utility in Texas. (D.I. 31, at p. 3). At the time of
the bankruptcy filing, EFIH had three creditor constituencies: $4 billion of first lien notes, $2.2
billion of second lien notes, and $1.7 billion of unsecured notes. (D.I. 32-1, App. 157). The first
lien notes were comprised of approximately $3.5 billion of 10% notes due 2020 and
approximately $500 million of $6^7/_8$% notes due 2017. (*Id.*, App. 155). Appellant is the indenture
trustee for the 10% noteholders.

Both of these notes contain "make-whole" provisions that protect the noteholder from
premature redemption. If EFIH redeems the notes prior to maturity, the make-whole clause
requires EFIH to pay a redemption premium to the noteholder. (D.I. 32-1, App. 78). The value of
this premium depends on the length of time remaining until the maturity date and the stated
interest rate of the note. (*Id.*). The parties agree that for the purpose of this appeal, the "make-

---

[1] Pacific Investment Management Company, LLC ("PIMCO") filed a Motion to Intervene (D.I.
25) as an interested party in this case, which the Court granted on August 25, 2014. (D.I. 30).
PIMCO filed a Motion to Dismiss on October 21, 2014. (D.I. 34). PIMCO's briefs and
arguments concentrate on mootness and are not inconsistent with the arguments of EFIH. Thus,
for the purpose of this opinion, both parties will be collectively referred to as "Appellee."

whole claims" of the $6^7/_8\%$ notes and the 10% notes are contractually identical, and will differ in value only to account for the different maturity dates and interest rates of those notes. Debtors and the noteholders do not dispute the amount of outstanding principal and interest due, but do dispute whether the make-whole claims constitute allowable claims in bankruptcy.

On the same day they filed their bankruptcy petition, Debtors filed a Restructuring Support and Lock-up Agreement ("Global Settlement") that documented a broad settlement reached among Debtors and various creditors. (D.I. 32-2, App. 201–435). This Global Settlement encompassed several discrete agreements, one of which was a settlement between Debtors and some of the first lien noteholders ("First Lien Settlement"). Debtors initiated this particular settlement through a tender offer to all first lien noteholders. (D.I. 37, App. at 103–05). The tender offer proposed to exchange the existing notes for new debt obligations to be issued under a $5.4 billion DIP Financing Facility. (*Id.*). The tender offer remained open for thirty-one days, though certain key terms would change periodically as time elapsed. (D.I. 32-2, App. 441). Debtors' tender offer compensated the noteholders with new value of 105% of their outstanding principal and 101% of the accrued interest. (D.I. 32-2, App. 195). Under the terms of the agreement, the noteholders agreed to release their disputed make-whole claims. (*Id.*). Because the new obligations issued under the DIP Facility carried a lower rate of interest than the existing first lien notes, Debtors projected that the deal would save the bankruptcy estate tens of millions of dollars per month in interest expenses. (D.I. 36, at p. 1).

Overall, 42% of the noteholders accepted the offer, which represented 97% of the $6^7/_8\%$ noteholders and 34% of the 10% noteholders. (D.I. 32-1, App. 24). While the settling noteholders released the disputed make-whole claims, the noteholders who did not accept the

3

tender offer retained their rights to litigate those claims.[2] (*Id.*, App. 49). On June 6, 2014, the Bankruptcy Court conducted a hearing to determine the propriety of the First Lien Settlement. (D.I. 32-1, App. 1–44). At the conclusion of the hearing, the Bankruptcy Court approved the First Lien Settlement under Federal Rule of Bankruptcy Procedure 9019 and entered an order to that effect the same day. (D.I. 1-1). Debtors have since withdrawn the Global Settlement, with the exception of the First Lien Settlement, which remains in effect and is the subject of this appeal. (D.I. 37, App. 288–91). Appellant attempted and failed to obtain a stay pending appeal of the June 6 Settlement Order from the Bankruptcy Court and this Court. (*Id.*, App. 285–87; D.I. 11). On June 9, 2014, Appellant timely appealed from the June 6 Settlement Order. After briefing by the parties, this Court heard oral argument on January 5, 2015.

## II. PARTIES' CONTENTIONS

Appellant does not challenge the Bankruptcy Court's factual findings in support of its approval of the First Lien Settlement under Federal Rule of Bankruptcy Procedure 9019. (D.I. 31, at p. 1). Appellant instead attacks the Settlement Order on the grounds that it provided a disparate effective recovery on the make-whole claims of the $6^7/_8\%$ and 10% noteholders. (*Id.* at pp. 4–5). Although the settlement offer provided an equivalent 5% principal premium to both classes of noteholders—apparently to induce them to settle the make-whole claims—the amount each class received compared to the maximum potential value of its respective make-whole claim was unequal. Because the amount of outstanding principal varies between the two classes, the proportion of the potential value of the make-whole claims of the $6^7/_8\%$ noteholders to the outstanding principal for those notes is smaller than the same proportion for the 10%

---

[2] As counsel for both parties represented to the Court at the oral argument, this litigation is ongoing. (D.I. 46, at p. 56).

4

noteholders.[3] Therefore, the 5% premium (which is pegged to the outstanding principal) translates into a different effective recovery for each class's make-whole claim. For the $6^7/8\%$ noteholders, 5% of their principal represents 64% of the maximum potential value of their make-whole claims; whereas, for the 10% noteholders, 5% of their principal amounts to only 27% of the maximum potential value of their make-whole claims. (D.I. 32-1, App. 112). Appellant argues that this effective recovery between the parties should be equal because the contractual language of the make-whole provisions is functionally identical.

Appellant contends that the Bankruptcy Court committed three legal errors by approving the First Lien Settlement: (1) the Debtors' use of the tender offer was improper; (2) approving a settlement that offered disparate make-whole claim recoveries to similarly situated creditors violated 11 U.S.C. § 1123(a)(4); and (3) the First Lien Settlement constituted an improper *sub rosa* plan. (D.I. 31, at p. 2). To remedy these alleged errors, Appellant does not ask the court to vacate the Settlement Order, but rather to remand with instructions that the Bankruptcy Court require Debtors to (1) offer all 10% noteholders the same effective recovery as the $6^7/8\%$ noteholders under similar conditions as the initial tender offer, (2) enjoin Debtors from using tender offers to propose further settlements in this case, and (3) impose any other relief that does not upset the validity of the DIP lending facility. (D.I. 31, at pp. 19–20).

In response, Appellee argues that Appellant's requests for relief make the appeal prudentially moot. (D.I. 36, at p. 3). Appellee contends that Appellant has not provided any legal support for its argument that tender offers cannot be used in pre-confirmation settlements. (*Id.* at p. 4). Appellee also argues that 11 U.S.C. § 1123(a)(4) applies only to confirmation plans, not pre-confirmation settlements. (*Id.*). Finally, Appellee argues that because it withdrew the other

---

[3] The 10% notes have more time remaining until maturity and a higher interest rate than the $6^7/8\%$ notes, which increases the value of the redemption premium and make-whole claims.

5

portions of the Global Settlement, Appellant cannot demonstrate that the First Lien Settlement by itself constitutes a *sub rosa* plan. (*Id.*).

## III. STANDARD OF REVIEW

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1).[4] This Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir. 1999).

## IV. DISCUSSION

### 1. Pre-Confirmation Settlement Through Tender Offer

Appellant argues that a tender offer is improper in a chapter 11 reorganization because the SEC plays a limited role in chapter 11 bankruptcies. (D.I. 31, at p. 7). Appellant points to 11 U.S.C. § 1109(a) to support this proposition. *Id.*; *see* 11 U.S.C. § 1109(a) ("[T]he Securities and Exchange Commission may not appeal from any judgment, order or decree entered in the case."). Appellant argues that tender offers are exceptionally rare in chapter 11 cases, and in reported decisions where the debtors have employed them, other interested parties did not raise a substantive challenge. *See, e.g., In re AMR Corp.*, 485 B.R. 279, 292 (Bankr. S.D.N.Y.), *aff'd*, 730 F.3d 88 (2d Cir. 2013), *cert. denied sub nom. U.S. Bank Trust Nat. Ass'n v. AMR Corp.*, 134 S. Ct. 1888 (2014). Appellant claims that it was improper for the Debtors to invoke an SEC-governed procedure in lieu of seeking judicial approval to initiate the First Lien Settlement offer. (D.I. 31, at p. 7).

---

[4] Though the parties do not address jurisdiction, this Court finds that the Bankruptcy Court's June 6 Settlement Order is a final order. *See In re Nutraquest, Inc.*, 434 F.3d 639, 643 (3d Cir. 2006).

6

The Court does not find these arguments persuasive. Pre-confirmation settlements are allowed under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 9019. These compromises are favored in order to minimize litigation and expedite the administration of the bankruptcy estate. *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996); *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006). In analyzing a proposed settlement, the Bankruptcy Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Id.* In order to approve the settlement, the Bankruptcy Court must ultimately find that it is fair and equitable and is not below the lowest point in the range of reasonableness. *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 475–76 (Bankr. D. Del. 2010). The Bankruptcy Code does not impose any restrictions on a debtor's ability to propose pre-confirmation settlements. *See In re Dow Corning Corp.*, 255 B.R. 445, 521 (E.D. Mich. 2000) ("There is no authority for the argument that settlement offers in bankruptcy actions must be structured like [a certain] case nor for the argument that settlement offers should not be patterned after non-bankruptcy mass tort cases."), *remanded for additional findings*, 280 F.3d 648 (6th Cir. 2002). Instead, the Code places the onus on the Bankruptcy Court to approve the transaction only after the parties have agreed upon the settlement. Fed. R. Bankr. P. 9019.

A tender offer is merely a vessel for issuers to comply with certain disclosure rules when offering securities publicly for sale or exchange. *See, e.g., Telenor E. Invest AS v. Altimo Holdings & Investments Ltd.*, 567 F. Supp. 2d 432, 442 (S.D.N.Y. 2008). The fact that the SEC's oversight in chapter 11 cases is relatively limited does not suggest that it is improper for a debtor to comply with securities laws. The Court does not need to draw inferences from Congress's decision to limit the SEC's involvement in chapter 11 as it relates to the applicability of securities laws in bankruptcy; the Bankruptcy Code already provides guidance on when these

7

laws apply. Section 1145 of the Bankruptcy Code carves out the specific situations where a

debtor and other involved parties are not required to comply with certain federal and state

securities laws:

> (a) Except with respect to an entity that is an underwriter as defined in subsection
> (b) of this section, section 5 of the Securities Act of 1933 and any State or local law
> requiring registration for offer or sale of a security or registration or licensing of an
> issuer of, underwriter of, or broker or dealer in, a security do not apply to--
>     (1) the offer or sale under a plan of a security of the debtor, of an affiliate
> participating in a joint plan with the debtor, or of a successor to the debtor under
> the plan . . .
>     (2) the offer of a security through any warrant, option, right to subscribe,
> or conversion privilege that was sold in the manner specified in paragraph (1) of
> this subsection . . .
>     (3) the offer or sale, other than under a plan, of a security of an issuer
> other than the debtor or an affiliate . . . or
>     (4) a transaction by a stockbroker . . . .

11 U.S.C. § 1145(a)(1). A fair reading of the § 1145(a) exemptions necessarily implies that at

least some securities laws remain in effect in chapter 11 cases in situations other than the four

enumerated scenarios. Since § 1145(a) does not include pre-confirmation settlement offers, it

stands to reason that Debtors deemed it necessary to comply with the appropriate securities

laws.[5] Regardless of whether Debtors' assessment was correct, or even whether Debtors made

such an assessment, the Court cannot accept the argument that the SEC's limited role in chapter

11 litigation somehow categorically forbids a debtor from complying with securities laws. Such a

position is at odds with § 1145(a), which clearly indicates that a debtor is not exempt from such

laws in all situations.

Appellant next argues that a tender offer is improper because it allows a debtor to

propose a debt-exchange settlement to an entire class of similarly situated creditors, and

potentially offer unequal treatment among the creditors in that class. Appellant alleges that using

---

[5] The parties did not discuss this point. Thus, the Court does not make any findings with respect
to the First Lien Settlement and the applicability of 11 U.S.C. § 1145(a).

pre-confirmation settlements instead of a plan will turn chapter 11 bankruptcies into "equity receiverships," which were an early form of debt restructuring that predated the Bankruptcy Act. Since Congress replaced equity receiverships with Chapter X in the 1938 Chandler Act, Appellant contends that a return to that process would violate Congress's intent in enacting that law. According to Appellant, a chapter 11 debtor can only accomplish a class-wide debt exchange with unequal treatment of creditors through a confirmed chapter 11 plan. Appellant cites to *Sec. & Exch. Comm'n v. Am. Trailer Rentals Co.*, 379 U.S. 594, 604 (1965), to support that proposition. (D.I. 31, at pp. 8–9). Appellant also suggests that class-wide debt exchange proposals will invite coercive behavior in pre-confirmation settlements. (*Id.* at p. 12).

Equity receiverships served as the means for failing railroads of the late nineteenth century to reorganize their debts. *See In re Premier Int'l Holdings, Inc.*, 423 B.R. 58, 66 (Bankr. D. Del. 2010). The procedure combined a court's equitable power to appoint receivers to preserve the value of debtor's property and the right of mortgage holders to foreclose on mortgaged property. *Id.* Typically, Wall Street investment banks that had underwritten the railroad's bonds would form protective committees to represent all bondholders to negotiate the railroad's restructuring. *Id.* This created two problems: "the process was controlled by and for the benefit of insiders . . . [and] there was unequal treatment of creditors." *Id.* at 67.

> The committees controlling the reorganization process were generally dominated by Wall Street investment firms working in concert with existing management. Dissenting creditors and stockholders had virtually no ability to participate in the process let alone to thwart the proposed reorganization. Moreover, the return for consenting creditors, i.e., committee members and depositors, was superior to that of non-consenting creditors.

*Id.* None of the dissenting bondholders individually had enough of a stake in the railroad to justify challenging the committees; they could either reject the committee's offers and recoup a

nominal amount in a fictitious foreclosure sale, or accede to the committee's plan and recover a much higher payout. *Id.*

In response to these problems, Congress enacted the Chandler Act in 1938, which adopted Chapter X of the Bankruptcy Act. *Id.* at 69. "The defining element of Chapter X was the mandatory appointment of a trustee in any case where the liabilities exceeded $250,000." *Id.* The trustee—not the creditors—had the power to formulate the reorganization plan. *Id.* These procedures were drawn to "eliminat[e] the domination of management and self-serving inner groups." *Id.* (citing Jacob I. Weinstein, The Bankruptcy Law of 1938: The Chandler Act (1938)).

The problems inherent with equity receiverships are neither present in this case nor implicated by a class-wide settlement offer. There is no evidence here of insider dealing, coercion of noteholders, or control by outside creditor groups. Debtors proposed the settlement offer and have controlled the reorganization process. (D.I. 33-1, App. 436–532). The First Lien Settlement offered all first lien noteholders at least 100% of their undisputed principal and interest. (D.I. 32-2, App. 195). Most importantly, noteholders that did not opt-in to the settlement preserved their right to litigate the disputed make-whole claims. (D.I. 32-1, App. 49). The non-accepting noteholders could potentially recover the full value of their claims. (D.I. 46, at pp. 55–57).[6] The Bankruptcy Code required the entire settlement to undergo judicial review. *See* Fed. R. Bankr. P. 9019. The Bankruptcy Court made the requisite factual finding of reasonableness, which Appellant does not challenge on appeal. (D.I. 31, at p. 1; D.I. 32-1, App. 38–39). In sum, the Bankruptcy Code's protections and the explicit terms of this deal established a negotiating environment that stands in stark contrast to the insider dealing of an equity receivership.

---

[6] The full value might be subject to a cramdown. (D.I. 48). Even were that to be the case, it would not affect the analysis.

Appellant additionally supports its argument through a hypothetical. (D.I. 31, at p. 12). In the example, Appellant posits a chapter 11 debtor with $1 billion in identical first lien secured bonds that receives court permission to obtain $800 million in DIP financing. (*Id.* at p. 13). The debtor offers to pay off the first lien bondholders, but only the first 80% of bondholders that accept. The other 20% of bondholders remain secured by their lien on the debtor's assets, but now fall to a second priority position due to the super-priority DIP lender. *See* 11 U.S.C. § 364(d)(1). Although the non-accepting bondholders are still entitled to adequate protection of their interest, they are exposed to the risk that their collateral value depreciates—a risk no longer borne by the first 80% of accepting bondholders. Appellant argues that this creates a de facto second class of first lien bondholders, economically inferior to the other 80% of the bondholders that have accepted the settlement offer. Appellant claims that a debtor could "coerce" first lien bondholders to accept the tender offer at a discount because they will make concessions to ensure they receive the more favorable settlement offer.

This hypothetical suffers from two flaws. First, the Bankruptcy Court must approve any settlement under Rule 9019. The hypothetical settlement offer likely would raise questions as to its fairness and reasonableness. Second, the Bankruptcy Code already protects secured creditors against the risk of depreciating security values. Creditors with depreciating collateral values may petition the court for cash payments, replacement liens, or administrative expenses to provide the necessary adequate protection. *See* 11 U.S.C. § 361. The creditor can also lift the automatic stay to proceed against the collateral in the event it lacks adequate protection of its interest. *See* 11 U.S.C. § 362(d). Against that backdrop, it is unlikely that either (1) first lien fully secured lenders would accept less than 100% for their interest in the negotiating phase, or (2) any

11

bondholder in the 20% non-accepting class would be materially disadvantaged. The proposition that class-wide tender offers would invite coercion is speculative and unsupported.

Appellant also argues that this case is similar to *Sec. & Exch. Comm'n v. Am. Trailer Rentals Co.*, 379 U.S. 594, 604 (1965). According to Appellant, the Supreme Court there determined that the Bankruptcy Act required judicial approval for any class-wide pre-confirmation solicitations. (D.I. 31, at p. 9). Appellant misconstrues this case. In *Am. Trailer*, the Supreme Court examined eligibility differences between two types of bankruptcy proceedings—Chapter X and Chapter XI. *Am. Trailer Rentals Co.*, 379 U.S. at 611. The debtor in that case, a trailer rental company, had proposed a plan of arrangement under Chapter XI. *Id.* at 599. The SEC filed a motion to transfer the case to Chapter X. *Id.* The Court then weighed whether the debtor was eligible for the "'speed and economy' of Chapter XI, [or] the 'thoroughness and disinterestedness'" of Chapter X. *Id.* at 617. Chapter X "provid[ed] greater judicial control over the entire proceedings and impartial and expert administrative assistance in corporate reorganizations through appointment of a disinterested trustee and the active participation of the SEC." *Id.* at 604. On the other hand, "Chapter XI [wa]s a statutory variation of the common-law composition of creditors and . . . provide[d] a summary procedure whereby judicial confirmation [wa]s obtained on a plan that ha[d] been formulated and accepted with only a bare minimum of independent control or supervision." *Id.* at 607–08.

The Court explained that while Chapter X is generally appropriate for adjusting publicly held debt, it may also apply when the facts of the case call for its greater protections. *Id.* at 614–15. The Court found that the case demonstrated a "clear[] need for a study by a disinterested trustee" under Chapter X because:

Respondent has never operated profitably, has always been in precarious financial condition, and apparently was hopelessly insolvent, in both the bankruptcy and

12

equity sense, when the arrangement was proposed. At an earlier period its
management apparently misappropriated substantial corporate funds.

*Id.* at 616. This holding provides no support for Appellant's argument. Contrary to Appellant's

assertion, *Am. Trailer* does not stand for the proposition that prior court approval is required

when a debtor proposes a settlement with disparate treatment of a class of creditors. (D.I. 31, at

p. 9) (citing *Am. Trailer Rentals Co.*, 379 U.S. at 603 n. 6). As Appellant recognizes, Congress

blended aspects of both Chapter X and Chapter XI when it created the present-day chapter 11 in

the 1978 Bankruptcy Code. (D.I. 31, at p. 9) (citing H. Rep. No. 95-595 at 224, *reprinted* in 1978

U.S.C.C.A.N. 5963, 6183). This renders *Am. Trailer's* analysis of the distinction between

Chapter X and XI outdated and irrelevant. The debtor in *Am. Trailer* did not offer a pre-

confirmation settlement, but instead proposed a full plan of restructuring. *Am. Trailer Rentals*

*Co.*, 379 U.S. at 599. Appellant's attempt to draw any reasoning from *Am. Trailer* and apply it to

this case is unpersuasive.

Plans of reorganization are not the exclusive mechanism to exchange debt or pay off

existing creditors in chapter 11. "There is no *per se* rule against paying pre-petition secured

claims outside of a plan of reorganization. Indeed, such payments are routinely made in a

number of different contexts." *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 510–11 (Bankr. D.

Del. 2010) (referring to payments made under 11 U.S.C. § 363(b)).

> [P]repetition secured claims can be paid off through a 'roll-up.' Most simply, a [roll
> up] is the payment of a pre-petition debt with the proceeds of a post-petition loan.
> Roll-ups most commonly arise where a pre-petition secured creditor is also
> providing a post-petition DIP loan under section 364(c) and/or (d) of the
> Bankruptcy Code. The proceeds of the DIP loan are used to pay off or replace the
> pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus
> any new money being lent to the debtor. As a result, the entirety of the pre-petition
> and post-petition debt enjoys the post-petition protection of section 364(c) and/or
> (d) as well as the terms of the DIP order. In both a refinancing and a roll-up, the
> pre-petition secured claim is paid through the issuance of new debt rather than from
> unencumbered cash.

13

*Id.* at 511.

The Court rejects Appellant's arguments. The First Lien Settlement was simply a roll-up of the first lien noteholders with the new DIP financing. The Court holds that Debtors' use of the tender offer to accomplish this exchange was not improper under bankruptcy law.

### 2. Pre-Confirmation Settlements and 11 U.S.C. § 1123(a)(4)

Appellant argues that because the 10% and $6^7/_8$% noteholders received different effective recoveries on their make-whole claims, the Bankruptcy Court erred as a matter of law by permitting different treatment of creditors in the same class. (D.I. 31, at p. 14). Appellant contends that 11 U.S.C. § 1123(a)(4) mandates that creditors of the same class must receive equal treatment in chapter 11. (*Id.*).

By its express terms, 11 U.S.C. § 1123(a)(4) applies only to plan confirmations: "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest. . . ." To overcome this obstacle, Appellant suggests that this court should adopt the logic of *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984). In that case, the Fifth Circuit found that the bankruptcy court had erroneously approved a debtor's pre-confirmation settlement with a junior creditor because it violated the absolute priority rule. *Id.* Despite the fact that the absolute priority rule (codified as § 1129(b)(2)(B)) applied only to plan confirmations, *AWECO* reasoned that for a settlement to be fair and equitable, it must comply with the fundamental bankruptcy notion of priority of creditors. *Id.* Appellant urges the Court to similarly import § 1123(a)(4)— another requirement for chapter 11 plan confirmation—and apply it to pre-confirmation settlements. (D.I. 31, at p. 14). According to Appellant, the equal treatment principle codified in

14

§ 1123(a)(4) is a fundamental bankruptcy protection equally as important as the absolute priority rule, and thus debtors should not be able to dispense with this protection in a pre-confirmation settlement. (D.I. 31, at p. 14).

*AWECO*, however, is not the law of this circuit. Nor has this Court adopted its position extending the absolute priority rule to pre-plan settlements. *See In re Jevic Holding Corp.*, 2014 WL 268613, at *3 (D. Del. Jan. 24, 2014) ("As discussed by the bankruptcy court, the settlement does not follow the absolute priority rule. However, this is not a bar to the approval of the settlement as it is not a reorganization plan."); *see also In re World Health Alternatives, Inc.*, 344 B.R. 291, 298 (Bankr. D. Del. 2006). Analogous arguments that other confirmation rules should apply to pre-confirmation settlements have also failed in this district. *See In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010) (holding that § 1129(a)(7) does not apply to pre-confirmation settlements).

Even if § 1123(a)(4) did apply to a pre-confirmation settlement, the First Lien Settlement does not violate that provision. Section 1123(a)(4) permits creditors to agree to less favorable treatment. To the extent that the First Lien Settlement treated the make-whole claims of the 10% noteholders and the $6^7/8$% noteholders differently, those parties voluntarily accepted that treatment. Appellant's interpretation of the phrase "equal treatment" is also flawed. "Although neither the Code nor the legislative history precisely defines the standards of equal treatment, courts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (internal citations and quotations omitted).

Section 1123(a)(4), therefore, would not require Debtors to offer the 10% noteholders a 64% recovery on their make-whole claims simply because the Debtors offered those terms to the

15

$6^7/8\%$ noteholders. Parties settle claims for various reasons, such as to avoid litigation risk and expense, and the fact that similar claimants decide to settle claims for different amounts does not indicate unequal treatment. *See In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008). "Providing different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123." *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). Though Debtors' offer may have treated the make-whole claims for the 10% noteholders and the $6^7/8\%$ noteholders differently, each noteholder had the opportunity to decline the settlement offer and litigate for the full value of the claim. *See id.*

The Court finds that the Bankruptcy Court's approval of the First Lien Settlement did not constitute legal error under 11 U.S.C. § 1123(a)(4).

### 3. *Sub Rosa* Plan

Appellant argues that the First Lien Settlement constituted an improper *sub rosa* plan. (D.I. 31, at p. 16). A *sub rosa* plan is one where a chapter 11 debtor constructs a broad settlement that amounts to a de facto plan of reorganization, which enables a debtor to restructure its debt while bypassing many of the Bankruptcy Code's fundamental creditor protections. *See In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 251 (D. Del. 1998). A court can deem a settlement to be an impermissible *sub rosa* plan if "the settlement has the effect of dictating the terms of a prospective chapter 11 plan." *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010). "To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote." *Id.* at 513.

Appellant's argument relies on viewing the First Lien Settlement in conjunction with all parts of the Global Settlement. (*See* D.I. 31, at pp. 16–17) ("The Global Settlement and RSA, which supposedly justified the embedded First Lien Settlement, disposed of all claims against the estate and restricted creditors' rights to vote."). Debtors have since withdrawn the Global

16

Settlement, and only the First Lien Settlement remains operative. (D.I. 37, App. 288–91).

Appellant recognizes this problem, and requests that the court evaluate the *sub rosa* claim at the time the Bankruptcy Court approved the First Lien Settlement, when the Global Settlement was still pending. (D.I. 36, at p. 20). Appellant does not provide any legal authority to support this proposition. The Court will not presume the existence of facts and circumstances that the record directly contradicts. (D.I. 37, App. 288–91). Appellant has not demonstrated how the First Lien Settlement by itself disposes of all claims against the estate or restricts creditors' rights to vote. There is no evidence in the record that the First Lien Settlement provides for either of these results.

The Court rejects this argument and finds that the Bankruptcy Court did not err in failing to conclude that this settlement constituted a *sub rosa* plan.

## V. Conclusion

The Bankruptcy Court did not commit legal error by approving the First Lien Settlement. Debtors' use of the tender offer to propose the First Lien Settlement was not improper. The First Lien Settlement's disparate treatment of the disputed make-whole claims of the $6^7/8\%$ noteholders and the 10% noteholders did not violate 11 U.S.C. § 1123(a)(4). The First Lien Settlement did not constitute a *sub rosa* plan. Based on these conclusions, the Court need not reach the "prudential mootness" argument. Accordingly, the Bankruptcy Court's June 6, 2014 Order is **AFFIRMED** and PIMCO's Motion to Dismiss is **DISMISSED**.

An appropriate Order will issue.